## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

TERRY KENNEDY,

                        Plaintiff,

        vs.

DAVID J. SHULKIN, MD, Secretary,
Department of Veterans Affairs;

                    Defendant.

8:15CV389

MEMORANDUM
AND ORDER

This matter is before the Court on the Motion for Summary Judgment, ECF No. 48, and the Motion to Strike, ECF No. 62, filed by Defendant David Shulkin ("Shulkin"). For the reasons stated below, the Motion for Summary Judgment will be granted and the Motion to Strike will be denied as moot.

## BACKGROUND

Terry Kennedy ("Kennedy"), the Plaintiff and an African-American, began working as a Police Officer for the Police Service of the Veterans Affairs Medical Center in Omaha, Nebraska ("Omaha VA"), in March 2009. In January 2011, Kennedy was promoted from Police Officer to Sergeant, and in January 2012, he was promoted from Sergeant to Lieutenant. The Police Service Command Staff was composed of the Chief of Police, Deputy Chief of Police, and two Captains. As one of four Lieutenants, Kennedy served as a first-line supervisor to the Sergeants and Police Officers assigned to his shift. Lieutenants also were generally responsible for planning daily duty schedules and ensuring that their shifts were sufficiently staffed to meet the minimum coverage requirements of the Omaha VA.

In May 2013, the Chief of Police, Mark Kula, was removed from his position for medical reasons. Thereafter, the Deputy Chief of Police, Ron Feather ("Feather"), became the Acting Chief of Police, and Captain Jason Brdicko ("Brdicko") became the Acting Deputy Chief of Police. At that time, the Omaha VA Police Service was operating with four rotating twelve-hour shifts—two day shifts (6 a.m. to 6 p.m.) and two night shifts (6 p.m. to 6 a.m.). Roughly every three months, the officers on the day shifts switched to the night shifts and the officers on the night shifts switched to the day shifts. One Lieutenant was assigned to each of the four shifts and, as of May 2013, Kennedy was assigned a night shift.

Throughout 2013 and 2014, the Police Service struggled with a staffing shortage after job classification authority was removed from local VA human resources offices to the Centralized Classification Unit ("CCU") in Minneapolis, Minnesota. There were several vacancies at the Police Service in 2013 and 2014, but hiring new officers was given low priority by the CCU. As a result, it took up to eight months for the Police Service to get a classified position description from the CCU, which made it difficult to fill vacancies.

Kennedy was unhappy with many of the decisions made, and actions taken, by his supervisors, Feather and Brdicko, between May 2013 and February 2014. He resigned from his position on March 22, 2014, and accepted another position with the Office of Security and Law Enforcement in Little Rock, Arkansas.

<u>Proposed Changes to Kennedy's Shift, Hours, and Schedule</u>

On July 8, 2013, Captain Ross Venditte sent out an email with new shift assignments and Kennedy was again assigned to the night shift, even though his shift

2

was scheduled to rotate to the day shift on or about July 8. His shift was also assigned one less officer than the other three shifts. However, the new assignments were never implemented. Instead, Feather and Brdicko proposed a permanent schedule that consisted of three ten-hour shifts, rather than four rotating twelve-hour shifts. The three shifts included a day shift (6 a.m. to 4 p.m.), a swing shift (11 a.m. to 9 p.m.), and a night shift (8 p.m. to 6 a.m.). The proposal was put to a vote and the officers approved the three-shift schedule which was implemented in early August. At that time, the Police Service had only three Lieutenants on staff and each was able to choose a shift based on seniority. Kennedy was given the swing shift, his second choice. Due to staffing shortages, however, the swing shift was given one less officer than the other shifts, because the swing shift overlapped with the other shifts on all but four hours. Kennedy was unhappy about the initial proposal to extend his tour on the night shift and the decision to provide the swing shift with fewer officers.

Even after switching to the three-shift schedule, the Police Service continued to have staffing problems, particularly on the swing shift. In early November 2013, Feather and Brdicko proposed altering the swing shift hours to 2 p.m. to 12 a.m. in order to ensure minimum coverage. The altered hours were set to begin on December 2, 2013, but this proposal was not implemented after some of the swing-shift officers expressed concerns.

On February 4, 2014, Feather and Brdicko suggested another change to Kennedy's schedule in order to address persistent staffing problems. They decided to change Kennedy's days off from Saturday, Sunday, and Monday, to Tuesday, Wednesday, and Thursday. This schedule change, however, also was not implemented.

Kennedy contacted an Equal Employment Opportunity ("EEO") Counselor on February 5, 2014, regarding his concerns that Feather and Brdicko were discriminating against him based on his race and retaliating against him for prior complaints to an EEO counselor.

### Vacant Captain Position

When Brdicko became Acting Deputy Chief of Police in May 2013, Feather decided to have the Lieutenants on the day shift fill Brdicko's vacant Captain position because it was a day shift position. This arrangement lasted for one month before Feather decided that he, Brdicko, and the other permanent Captain, Ross Venditte, would cover the vacant Captain position's responsibilities, rather than the Lieutenants. Kennedy was on the night shift and not given an opportunity to rotate into the Captain position during that time. On July 22, 2013, Kennedy contacted an EEO counselor because he was not promoted to Acting Captain and not temporarily rotated into the vacant Captain position.

### Off-Duty, Part-Time Employment

At some point "[i]n the fall of 2013," Kennedy and several other Omaha VA Police Service officers were terminated from their part-time employment as security guards at No Frills Supermarket after Feather called the store manager to inquire about their job duties there. Def.'s Br. Summ. J., ECF No. 51, Page ID 549. Feather claims that the store manager explained the security jobs required the authority to enforce state and city ordinances on No Frills Supermarket property, as well as the use of federally issued police credentials. Feather claims he then informed the store manager that VA Police Officers have no authority to enforce state law or city ordinances and that it is contrary

4

to VA policy for them to use their police credentials in their employment with No Frills Supermarket. Kennedy disputes Feather's statement and claims that Feather sought to have him fired for racial and retaliatory purposes. Kennedy Aff., ECF No. 59-1, Page ID 647 ¶ 7 & Page ID 653 ¶ 28. Kennedy again contacted an EEO counselor, on December 5, 2013, regarding Feather's contact with his part-time employer.

CCTV and Eleventh Floor Access

Also in the fall of 2013, Feather sent an email to all Lieutenants and Sergeants instructing them to stop using an office located on the eleventh floor of the Omaha VA facility.  On November 7, 2013, Feather asked that Kennedy and other officers return their keys to that office, but Kennedy didn't return his keys and continued to use the office. Accordingly, Brdicko continued to send out emails instructing officers to stop using the eleventh floor office.

On January 31, 2014, Feather temporarily suspended access to the closed-circuit television ("CCTV") for all Lieutenants, Sergeants, and Police Officers to investigate potential violations of the CCTV policy. After an investigation was conducted, access was restored to all Lieutenants, Sergeants, and Police Officers. Kennedy perceived Feather's decision to revoke eleventh floor and CCTV access as both discriminatory and retaliatory.

Miscellaneous Conflicts

On one occasion, Kennedy reported another officer to the Command Staff for threatening a co-worker. In his affidavit Kennedy stated "I believe that Acting Chief Feather told [the reported officer] about my report," and that the reported officer became "insubordinate" toward Kennedy as a result. Kennedy Aff., ECF No 59-1, Page ID 651 ¶

5

22. Kennedy claims that Feather then deliberately chose not investigate the reported officer in an effort to discriminate and retaliate against Kennedy. He further claims Feather and Brdicko regularly refused to communicate with him and that on another occasion, they "barg[ed] into an office where [Kennedy] was conducting training with [another officer]" in an effort to "gather dirt" on him. Kennedy Aff., ECF No. 59-1, Page ID 648 ¶ 9. Kennedy also cites an instance on February 6, 2014, where Brdicko "slandered" him by "calling [him] incompetent in front of other officers." Kennedy Aff., ECF No. 59-1, Page ID 649 ¶ 15.

### Police Service Credentials and Firearms Authority

On February 6, 2014, Kennedy saw a physician due to stress he was experiencing at work. After the visit to his physician, Kennedy called Captain Ross Venditte and informed him that he would not be returning to work for 30 days because he had been placed under a doctor's care. Feather then suspended Kennedy's firearms authority and credentials. Brdicko also sent Kennedy a notice alerting him of the decision and that Kennedy would need to provide a physician's statement confirming his fitness to return to work. Although Kennedy acknowledges that VA policy grants the Chief of Police the discretion to suspend an officer's firearm credentials, he asserts the policy was selectively enforced in order to discriminate and retaliate against him.

Kennedy never returned to the Omaha VA Police Service after February 6, 2014. Instead, he officially resigned on March 22, 2014, to accept employment at the Office of Security and Law Enforcement in Arkansas. He applied for this position in October of 2013.

Kennedy claims race discrimination, retaliation, and hostile work environment under Title VII, citing the foregoing decisions and courses of action taken by Feather and Brdicko between May 2013 and February 2014. Shulkin's Motion for Summary Judgment argues that Kennedy's race discrimination and retaliation claims should be dismissed because Kennedy has provided no evidence of a materially adverse employment action. Shulkin also argues that Kennedy's hostile work environment claim should be dismissed because the evidence does not show that he was subjected to race-based harassment.

### STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th

Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "the absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of

material fact" for trial and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076 (quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

## DISCUSSION

Title VII of the Civil Rights Act prohibits employment discrimination on the basis of race. 42 U.S.C. § 2000e-2(a). Title VII also prohibits retaliation against an employee "because he has made a charge, testified, assisted, or participated in . . . an investigation, proceeding, or hearing under 42 U.S.C. § 2000e-3(a).

"To survive a motion for summary judgment with a Title VII claim, a plaintiff must show either direct evidence of a Title VII violation or create an inference of discrimination or retaliation under the *McDonnell Douglas*[1] burden-shifting framework." *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015). "Direct evidence of discrimination requires 'a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision.'" *Id.* (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003)) (alteration in original). Similarly, "[d]irect evidence of retaliation" requires "a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse-action was in retaliation for the protected conduct." *Lors v. Dean*, 746 F.3d 857, 865 (2014). "'[D]irect refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012).

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

Absent direct evidence, "the *McDonnell Douglas* framework applies, which requires a plaintiff to make a prima facie case of discrimination or retaliation." *Shirrell*, 793 F.3d at 887. If the plaintiff establishes a prima facie case, "a presumption of discrimination [or retaliation] arises and the burden shifts to [the defendant] to present evidence of a 'legitimate, nondiscriminatory reason for' its adverse employment action." *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016) (quoting *McDonnell Douglas*, 411 U.S. at 802). "If [the defendant] meets that burden, the presumption disappears and [the plaintiff] must prove [the defendant's] proffered justification is merely a pretext for discrimination." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015).

## I. Race Discrimination

Kennedy has provided no direct evidence of race discrimination. There are no racially discriminatory statements, comments, remarks, or other evidence indicating a "specific link" between racial animus and any of the decisions made by Feather or Brdicko. *Shirrell*, 793 F.3d at 887. Although Kennedy offers statements from his coworkers, Scarlet Schwab and Korey Jones, that they believed Feather and Brdicko made decisions with racial animus, their statements are conclusory and lack detail. Neither Kennedy's affidavit nor his coworkers' affidavits[2] draw a specific link between a particular course of action and racial animus. Kennedy must, therefore, satisfy the

---

[2] The Court also notes that Officer Korey Jones's statements are both unsigned and unsworn. As such, Kennedy cannot rely on Korey Jones's statements to oppose a motion for summary judgment. *Risdal v. Nixon*, 589 Fed. App'x 801, 803 (8th Cir. 2014) (unsworn statements may not be relied upon by the district court at the summary judgment stage).

*McDonnell Douglas* burden-shifting framework by first establishing a prima facie case of race discrimination.

"To establish a prima facie case for race discrimination, a plaintiff 'must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Gibson v. Am. Greeting Corp.*, 670 F.3d 844, 853-54 (8th Cir. 2012). Shulkin contends, and the Court agrees, that Kennedy has presented no evidence of an adverse employment action.

"An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage." *Jones v. City of St. Louis, Mo.*, 825 F.3d 476, 480 (8th Cir. 2016) (quoting *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013)). This includes, but is not limited to, "termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Id.* However, "minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Jackman*, 738 F.3d at 804.

Kennedy was not terminated or suspended, neither his pay nor his benefits were reduced, and there was no significant change in his job duties or responsibilities. Although Kennedy points out that he was, at some point, ordered to focus on managing his swing shift scheduling rather than conducting training exercises and drafting departmental memos, there is no evidence that such an order amounted to anything

11

more than a minor change in duties. *See id.* (explaining minor changes in job duties do not constitute materially adverse employment action). Kennedy, however, maintains that he suffered an adverse employment action because he was constructively discharged. Pl.'s Br. Summ. J., ECF No. 58, Page ID 631 (stating Kennedy "was forced to switch jobs as a result of the extreme mental distress he went through").

"Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing him to quit," and "[j]ust like any other discharge, a constructive discharge is an adverse employment action." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007) (applying constructive discharge analysis to the materially adverse employment action element of Title VII race discrimination claim). "To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in his situation would find the working conditions intolerable, and (2) the employer intended to force him to quit." *Id*. The intent requirement may be satisfied with "evidence that [the plaintiff's] resignation was a reasonably foreseeable consequence of the employer's actions." *Quinn v. St. Louis Cty.*, 653 F.3d 745, 752 (8th Cir. 2011).

Kennedy argues the following courses of action taken by Feather and Brdicko collectively resulted in his constructive discharge: suspending his firearms authority and credentials, proposing to extend his tour on the night shift, proposing to alter his hours and days off, criticizing Kennedy's job performance in front of other officers, revoking Kennedy's CCTV and eleventh floor access, understaffing Kennedy's shift, and failing to

investigate one of Kennedy's insubordinate officers.[3] Pl.'s Br. Summ. J., ECF No. 58, Page ID 630-31. Kennedy cannot establish either of the constructive discharge elements with the foregoing actions.

The proposed changes to Kennedy's shift and days off were, ultimately, never implemented, and access to the eleventh floor and CCTV was revoked from all Lieutenants, Sergeants, and Police Officers. Thus, there was nothing objectively intolerable about these decisions. Further, it was not objectively intolerable for Kennedy to surrender his badge, service weapon, and credentials until he returned from his voluntary thirty-day leave of absence with a satisfactory physician's statement because he would have had no use for them while on extended leave.

With respect to the criticism of Kennedy's job performance, Kennedy simply states in his affidavit that on one occasion "Deputy Chief Brdicko slandered me and created a hostile working environment by shouting at me and calling me incompetent in front of other officers." Kennedy Aff., ECF No. 59-1, Page ID 649 ¶ 15. Kennedy similarly states that Feather "refus[ed] to properly investigate and or discipline" an officer who became "insubordinate" in order to racially discriminate against him. Kennedy Aff., ECF No. 59-1, Page ID 651 ¶ 22. This evidence lacks detail and does not satisfy the burden of establishing objectively intolerable working conditions or that Feather and Brdicko intended to force Kennedy to quit, even when considered collectively. *See O'Brien v. Dep't of Agric.*, 532 F.3d 805, 810-11 (8th Cir. 2008)

---

[3] Although Kennedy continues to reference his termination from his part-time employment and lack of rotation into the vacant Captain position at the Omaha VA as evidence of race discrimination, the Court has previously ruled that such evidence may only be used as background evidence in support of a hostile work environment claim. *See* Memorandum and Order, ECF No. 21, Page ID 301-02.

(explaining that the burden of establishing intolerable working conditions is "substantial" and that "the bar is quite high") (citing *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (stating the conditions must be "sufficiently extraordinary and egregious").

It is undisputed that Kennedy's shift was understaffed, but it is also undisputed that the Omaha VA Police service was experiencing significant staffing shortages throughout the department. Kennedy does not dispute that the reason for assigning his swing shift one less officer than the day and night shifts was because the swing shift overlapped with the day and night shifts for all but four hours. Pl.'s Br. Summ. J., ECF No. 58, Page ID 604 ¶ 36. As such, Kennedy has not established that Feather and Brdicko assigned him one less officer with the intent of forcing him to quit.

Not only do the actions Kennedy complains of, when viewed collectively, fail to establish a constructive discharge, they also fail to establish any adverse employment action when viewed independently. *See, e.g.*, *Carpenter v. Nw. Airlines, Inc.*, 47 Fed. App'x 424, 426 (8th Cir. 2002) (finding that a critique of an employee's poor job performance was not an adverse employment action); *Stoddard v. Eastman Kodak Co.*, 309 Fed. App'x 475, 479 (2nd Cir. 2009) (finding criticism of an employee's job performance is not adverse employment action, even where the employee considered it excessively harsh); *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (concluding that revoking an officer's badge, service weapon, and credentials after she voluntarily took extended sick leave is not an adverse employment action in the context of a Title VII race discrimination claim); *Hughes v. Stottlemyre*, 454 F.3d 791, 797 (8th Cir. 2006) (finding a schedule change that required an employee to work undesirable days and hours was not an adverse employment action).

14

Accordingly, Kennedy has produced no evidence of a materially adverse employment action and has, therefore, failed to establish a prima facie case of race discrimination under Title VII.

**Retaliation**

The evidence shows no specific link between Kennedy's protected conduct and any of the actions taken by Brdicko or Feather. Therefore, there is no direct evidence of retaliation and Kennedy must satisfy the *McDonnell Douglas* framework by first establishing a prima facie case of retaliation.

"To establish a prima facie case of retaliation, a plaintiff must show that: '(1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two.'" *DePriest v. Milligan*, 823 F.3d 1179, 1187 (8th Cir. 2016) (quoting *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 (8th Cir. 2014)). Shulkin contends Kennedy has presented no evidence of an adverse employment action to support a retaliation claim. The Court agrees.

Adverse employment action must be "materially adverse, which in [the retaliation] context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*; *Jackman*, 728 F.3d at 804-05. Thus, the adverse employment action standard is broader for retaliation claims than discrimination claims. *See Burlington*, 548 U.S. at 68.

The Parties do not dispute that Kennedy engaged in protected conduct on July 22, 2013, and December 5, 2013; and Kennedy also claims he engaged in protected conduct on November 17, 2013, by communicating his concerns of discrimination and hostile work environment to Brdicko and Feather. Kennedy further contends that the

15

following courses of action were both materially adverse and the causal result of his protected activity: understaffing his swing shift; proposing to alter his hours and change his days off; abruptly interrupting Kennedy's training session; avoiding communication with Kennedy; ordering Kennedy to focus on shift coverage rather than training and memo drafting; criticizing his job performance; revoking his CCTV and eleventh floor access; suspending his firearms authority and credentials, and failing to investigate and discipline an insubordinate officer.

As the Court previously noted, the proposals to extend Kennedy's tour on the night shift, alter his swing shift hours, and change his days off were never implemented. The CCTV and eleventh floor access was revoked for all Lieutenants, Sergeants, and Police Officers, not just for Kennedy. Thus, evidence of those actions and decisions do not, as a matter of law, establish a materially adverse employment action. *See Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1080-81 (8th Cir. 2010) (citing *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (proposed suspension was not materially adverse because the suspension was not actually served)); *See AuBuchon v. Geitner*, 743 F.3d 638, 645 (8th Cir. 2014) (citing *Burlington*, 548 U.S. at 68) ("petty slights or minor annoyances that often take place at work and that all employees experience" do not constitute unlawful retaliation). A reasonable jury could not find that avoiding communication with Kennedy, criticizing his ability to staff his shift, and unexpectedly barging in on a training session, amounted to materially adverse employment actions. *See Knapp v. Ruser*, 145 F. Supp. 3d 846, 861-62 (D. Neb. 2015) (cessation of communication with an employee does not approach any semblance of

adverse employment action) (citing *Burlington*, 548 U.S. at 68) ("Title VII . . . does not set forth a general civility code for the American workplace").

Suspending Kennedy's credentials and having him turn in his badge and service weapon during a voluntary leave is also not a materially adverse employment action. *Simmons v. Dep't of Cent. Mgmt. Servs.*, No. 02 C 9492, 2004 WL 2584801, at *7 (N.D. Ill. Nov. 10, 2004) ("Requiring Plaintiff to turn in her badge and weapon while not on active duty during her injury leave of absence does not constitute an adverse employment action."). Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm," *Burlington*, 548 U.S. at 67, and Kennedy has provided no evidence that suggests he was harmed or injured in any way by the suspension of his credentials and firearms authority while on extended voluntary leave.

Similarly, ordering Kennedy to focus on ensuring coverage for his shift, and refusing to investigate another officer for insubordination, do not amount to materially adverse employment actions. The evidence provides very little detail regarding these complaints and no basis to conclude that Kennedy was harmed or injured. *See Burlington*, 548 U.S. at 68 (a plaintiff claiming retaliation must show harm that is more than merely trivial). Based on the evidence, a reasonable jury could not find that providing Kennedy's swing shift one less officer than the other shifts "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*; *See Peace-Wickham v. Walls*, 409 Fed. App'x 512, 523 (3rd Cir. 2010) (concluding that evidence of continued understaffing does not constitute materially adverse employment action).

17

Kennedy has provided no evidence that he suffered a materially adverse employment action and has, therefore, failed to establish a prima facie case of retaliation under Title VII.

**Hostile Work Environment**

Kennedy claims that the actions and decisions of Feather and Brdicko created a hostile work environment.

"Hostile work environment harassment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016) (quoting *Jackman*, 728 F.3d at 804). To prevail on a hostile work environment claim, a plaintiff must "establish that (1) he is a member of a protected group; (2) he was subject to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of employment." *Banks*, 829 F.3d at 667 (quoting *Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011)).

Kennedy has produced no racially motivated comments, remarks, insults, or actions to establish his allegation that he was subjected to race-based harassment. *See* Pl.'s Br. Summ. J., ECF No. 58, Page ID 640-42. Kennedy simply argues that his coworkers—Officer Schwab, Officer Jones, and former Chief Kula—"felt" and "believed" he experienced race discrimination, but "[t]o survive summary judgment, [Kennedy] must substantiate his allegations with more than 'speculation, conjecture, or fantasy.'" *Ngrime v. Douglas Cty.*, No. 8:07CV387, 2009 WL 2486426, at *6 (D. Neb. Aug. 12,

18

2009) (quoting *Marquez v. Bridgestone/Firestone, Inc.*, 353 F.3d 1037 (8th Cir. 2004)). Although, Officer Schwab stated that she heard race-based comments while she worked at the Omaha VA, she was unable to provide any details or a specific instance where such comments were directed at Kennedy. Schwab Aff., ECF No. 59-1, Page ID 685 ("it's been so long ago . . . I really can't give you [an example] that would be correct"). "[T]he alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment," and on the evidence provided, no reasonable jury could find that Kennedy suffered race-based harassment at all, let alone race-based harassment to such a high degree. *Blomker v. Jewell*, 831 F.3d 1051, 1057 (8th Cir. 2016).

## CONCLUSION

Kennedy has failed to produce any direct evidence of race discrimination or retaliation and he has failed to establish a prima facie case for either claim. He has similarly failed to provide any evidence that he was subjected to race-based harassment at the Omaha VA. Therefore, his Title VII claims of race discrimination, retaliation, and hostile work environment will be dismissed.

Finally, the Court will deny Shulkin's Motion to Strike, which was filed contemporaneously with the Reply Brief. Officer Korey Jones's statements and affidavits cannot be relied upon to oppose the Motion for Summary Judgment; and the remaining evidence, regardless of its admissibility, does not sufficiently establish Kennedy's claims. The Motion to Strike is, therefore, moot.

Accordingly,

IT IS ORDERED:

19

1.     The Motion for Summary Judgment, ECF No. 48, filed by Defendant David Shulkin is granted;

2.     This action is dismissed, with prejudice;

3.     The Motion to Strike, ECF No. 62, filed by Defendant David Shulkin is denied as moot; and

4.     A separate judgment will be entered.

Dated this 19th day of July, 2017.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge